994 P.2d 569

Leonard K.K. FONG and Ellen Lee Fong, Plaintiffs–Appellants,

and

Dale S.N. Fong and Linda L. Fong, Intervening Plaintiffs–Appellants,

v.

Muriel Y. HASHIMOTO and Susan M. Hashimoto, as Trustees of the Living Trust of Gerald S. Hashimoto and Muriel Y. Hashimoto dated October 13, 1992, and Susan M. Hashimoto, individually, Defendants–Appellees.

No. 19424.

Intermediate Court of Appeals of Hawai'i.

Feb. 20, 1998.

Certiorari Granted April 2, 1998.

Trudy Burns Stone and Andrew R. Bunn, Chun, Kerr, Dodd, Beaman & Wong, on the briefs, Honolulu, for plaintiffs-appellants and intervening plaintiffs-appellants.

Michael A. Lilly and R. Laree McGuire, Ning, Lilly & Jones, on the brief, Honolulu, for defendants-appellees.

BURNS, C.J., ACOBA, and KIRIMITSU, JJ.

Opinion of the Court by ACOBA, J.

We hold that the legal title to land retained by a vendor pursuant to an agreement of sale is an interest sufficient to permit the vendor to impose restrictions on another parcel of land for the benefit of the land subject to the agreement of sale. Accordingly, based on the evidence adduced, we conclude that

the one-story and fifteen-foot setback restrictive covenants imposed on the lot currently owned by Defendants–Appellees Muriel Y. Hashimoto and Susan M. Hashimoto, as Trustees of the Living Trust of Gerald S. Hashimoto and Muriel Y. Hashimoto dated October 13, 1992 (the Hashimoto trustees), and Susan M. Hashimoto, individually (Susan), (collectively referred to herein as Defendants) were imposed for the benefit of the lot currently owned by Intervening Plaintiffs–Appellants Dale S.N. Fong (Dale) and Linda L. Fong (Linda) (collectively referred to herein as the Jr. Fongs). The record reveals that these restrictive covenants satisfy the requirements for "running with the land" as set forth in *Waikiki Malia Hotel v. Kinkai Properties Ltd. Partnership*, 75 Haw. 370, 383, 862 P.2d 1048, 1057 (1993), and therefore the Jr. Fongs are entitled to enforce the restrictive covenants on Defendants' lot.

Also, because a "common scheme" of one-story and setback restrictions was imposed on the subdivision by the common grantor, Edward P. Fogarty (Fogarty) and his estate, and because the conveyances made by Fogarty and his estate evidence that the common scheme existed when the sale of lots in the subdivision began, the Jr. Fongs and Plaintiffs–Appellants Leonard K.K. Fong and Ellen Lee Fong (the Sr. Fongs) may enforce the restrictions on Defendants' lot as equitable servitudes.

We further hold that a mandatory injunction is the appropriate relief against a landowner who has constructive notice of restrictive covenants affecting his or her lot, and who nonetheless violates those restrictive covenants. Defendants had constructive notice of the one-story and fifteen-foot setback restrictions on their lot.

Since we do not believe the record supports Defendants' contention that the Jr. Fongs and the Sr. Fongs (collectively referred to herein as Plaintiffs) abandoned their right to enforce the one-story restriction on Defendants' lot, we vacate the August 1, 1995 "directed verdict" and the October 27,

1995 judgment of the first circuit court (the court) entered in favor of Defendants, and remand to the court with instructions to enter an injunction requiring Defendants to remove portions of any structure on their lot violating the one-story and fifteen-foot setback restrictions.

I.

A.

The parties own lots in a subdivision known as the "Fogarty Subdivision," named for the common grantor of the lots, Fogarty. The subdivision consists of fifteen lots, twelve of which are located around a hammer-shaped road. The portion of the road resembling the hammer's handle is twenty feet in width and the hammerhead portion is fifteen feet in width. Entering the subdivision on this road, Lots 2 through 5 are adjacent lots located to the left, on the mauka[1] side of the road. The Jr. Fongs own Lot 4, and Dale's parents, the Sr. Fongs, own Lot 5. Lots 7 through 10 are adjoining lots located along the hammerhead end of the road. Lot 11, owned by Defendants, and Lots 12, 14, and 15 are adjacent lots located on the makai[2] side of the road, facing Lots 5, 4, 3, and 2, respectively.

1.

The following brief history traces the Jr. Fongs' and Sr. Fongs' chains of title to Lots 4 and 5.

a.

On March 27, 1940, Fogarty entered into an unrecorded agreement of sale to sell Lot 4 of the Fogarty Subdivision to John Carden Austin and Frances W. Austin (the Austins). The Austins assigned this agreement of sale to James Akana Ai and Frances Leong Ai (the Ais) by an unrecorded assignment, dated May 12, 1942.

The administrators of Fogarty's estate conveyed Lot 4 by way of a recorded deed to

---

1. Mauka is defined as "[i]nland, upland, towards the mountain[.]" M.K. Pukui & S.H. Ebert, *Hawaiian Dictionary* 242, 365 (6th ed.1986).

2. Makai is defined as "on the seaside, toward the sea, in the direction of the sea." *Id.* at 225, 114.

the Ais on January 24, 1944. The following covenant was contained in the deed:

That at no time shall any building or structure or any part thereof be erected or placed or allowed to remain on [Lot 4] within fifteen (15) feet of the property boundary line on the 20–foot right-of-way adjoining said premises.

The deed did not mention any height or view restrictions.

On September 21, 1984, the Ais conveyed Lot 4 to the Jr. Fongs through a recorded deed.

#### b.

On April 4, 1940, Fogarty executed a deed conveying Lot 5 of the Fogarty Subdivision to Noel Lee–Von Howell and Verona O. Howell (the Howells). This deed contained the following setback restrictions:

[A]t no time shall any building or structure or any part thereof be erected or placed or allowed to remain on [Lot 5] within fifteen (15) feet of the property boundary line on the 20–foot road right-of-way adjoining said premises, nor within five (5) feet of the property boundary line on the 15–foot road right-of-way adjoining said premises.

No view or height restrictions were mentioned in this deed.

The chain of title from the Howells to the Sr. Fongs is unbroken, with the Sr. Fongs acquiring Lot 5 by way of a deed recorded November 29, 1968 from Martin Fried and L. Louise Fried.

#### 2.

Defendants' chain of title to Lot 11 is as follows.

By an unrecorded agreement of sale dated April 5, 1941, Fogarty agreed to sell Lot 11 to Franklyn J. De Canio and Lucille C. De Canio (the De Canios).

On June 26, 1943, the administrators of Fogarty's estate conveyed Lot 11 to the De Canios by a recorded deed (the Fogarty Estate—De Canios deed). The deed stated that the property conveyed was "the same real property described in and covered by that certain [aforesaid] agreement of sale dated April 5, 1941, unrecorded." It further provided that "IT IS UNDERSTOOD AND AGREED that the execution of the within indenture by the Grantors shall constitute full compliance with and performance by [Fogarty] and the Grantors of any obligations under [the April 5, 1941 agreement of sale]."

The De Canios agreed to several restrictive covenants by the following provisions in the deed:

AND the Grantees, in consideration of the premises and of One Dollar ($1.00) received to their satisfaction from the Grantors, do hereby for themselves and their assigns, and the survivor of them and his or her heirs and assigns, *covenant and agree with the Grantors and their successors and assigns,* as follows:

1. That *at no time shall any building or structure or any part thereof be erected or placed or allowed to remain on the hereinabove described premises of more than one (1) story in height, nor within fifteen (15) feet of the property boundary line on the 20–foot road right-of-way adjoining said premises,* nor within five (5) feet of the property boundary line on the 15–foot road right-of-way adjoining said premises.

2. That *no deed, lease, mortgage or other conveyance of the premises hereby conveyed will be made unless the same shall in each case contain the same restrictive covenants, including this covenant, either expressly or by appropriate reference,* nor unless or until the grantee, lessee, mortgagee, or other person thereunder shall join therein and bind himself, his heirs and assigns to require the same covenants on the part of any grantee, lessee, mortgagee or other person under any deed, lease, mortgage or other conveyance made by him.

3. That *the foregoing covenants shall run with the land hereby conveyed and shall also apply to and be equally binding upon the legal representatives and successors in interest of the parties hereto, whether or not expressly contained in any deed or other instrument*

*whereby any title to or interest in said property is obtained.*

(Emphases added.)

The De Canios then conveyed Lot 11 to Aldoph J. Mendonca and Violet G. Mendonca (the Mendoncas) by way of a recorded deed dated August 16, 1943 (the De Canios—Mendoncas deed). This deed contained the same restrictive covenant provisions as quoted above from the Fogarty Estate—De Canios deed, except that the first paragraph stated that the grantees "covenant and agree with the Grantors, and their heirs, executors and administrators...."

In turn, the Mendoncas conveyed Lot 11 to Gerald S. Hashimoto and Muriel Y. Hashimoto (the Hashimotos) in a recorded deed dated February 10, 1946 (the Mendoncas—Hashimotos deed). This deed stated that the conveyance was "subject ... to ... [*inter alia*] [t]he covenants and building restrictions relative to the use of said land as set forth in [the De Canios—Mendoncas deed.]" The Mendoncas—Hashimotos deed did not detail these specific covenants and building restrictions.

On October 13, 1992, the Hashimotos executed a warranty deed, which they later recorded, conveying Lot 11 to the Hashimoto trustees. Exhibit A, attached to the deed, described the property and stated that the conveyance was "subject to [*inter alia*] all grants, easements, covenants, restrictions, liens, and encumbrances *of record.*" (Emphasis added.) This deed did not further specify such covenants or restrictions.

On December 23, 1994, the Hashimoto trustees executed a recorded deed conveying an undivided one-half interest to Susan, as a tenant in severalty, and retaining the other undivided one-half interest in the Hashimoto trustees as a tenant in common. The deed provided that the conveyance of Lot 11 was "subject ... to ... [*inter alia*] [r]estrictions, covenants and conditions as contained in [the De Canios—Mendoncas deed]."

### 3.

Fogarty restricted Lots 12 and 14, located on the same side of the road as Lot 11, in the same manner as Lot 11 was restricted by the administrators of his estate. The September 12, 1941 deed conveying Lot 12 from Fogarty to the Mendoncas contains the identical height and setback restrictions as found in the Fogarty Estate—De Canios deed for Lot 11. These restrictions were also included in the November 24, 1941 deed conveying Lot 14 from Fogarty to Sanford E. Andersen and Emily A. Andersen.

To summarize, the lots subject to one-story height restrictions were Lots 11, 12, and 14, located on the makai side of the road. Fogarty entered into an unrecorded agreement to sell Lot 11 to the De Canios on April 5, 1941, and then deeded Lots 12 and 14 on September 12, 1941 and November 24, 1941, with one-story restrictions included in those deeds. After Fogarty's death, when the administrators of his estate conveyed the deed to Lot 11 to the De Canios, the administrators included the same one-story restriction in that deed.

### B.

The dispute between the parties arose when Defendants, in January 1995, began building a two-story home on Lot 11. The Sr. Fongs represented that during the early stages of construction, the house appeared to be one story in height. The framing of the second story began on March 22, 1995. Linda testified that she noticed the second story the following day, was "appalled," and immediately informed Dale and the Sr. Fongs. Lots 4 and 5 are across the street and upslope of Lot 11, and by looking in part over Lot 11, have wide views of the ocean and surrounding land.

On April 7, 1995, Ellen Lee Fong talked to the owners of Lot 14, who explained that they did not build a higher house because of a restriction in their deed. She then talked to Susan's sister, informing her that the house on Lot 11 might be "too high," and Susan's sister relayed this message to Susan later that day. On April 12, 1995, Susan's sister obtained the deed to Lot 11 from her father's study and told Susan that there were restrictive covenants in the deed. The Sr. Fongs sent a letter dated April 14, 1995 to Defendants' contractor, Armstrong Builders (Armstrong), advising them that the con-

struction of Defendants' home "may be violating certain restrictions placed upon [Lot 11] by the developers [which] are recorded within [Defendants' deed]." Defendants stopped construction on April 14, 1995, but told Armstrong to resume construction on May 2, 1995.

## C.

### 1.

On May 30, 1995, the Sr. Fongs filed a complaint against Defendants seeking declaratory and injunctive relief. According to the complaint, "[the Sr. Fongs' lot] commands a panoramic view from both the first and second stories, from Diamond Head[3] to the Ewa[4] plains." The Sr. Fongs alleged that "Defendants' two-story building, if permitted to remain, w[ould] severely interfere with and shut off the view from the [Sr.] Fongs' home, to their great detriment."

The Sr. Fongs requested a judgment declaring that (1) the height and setback restrictions were restrictive covenants running with Defendants' land; (2) these restrictive covenants benefited the Sr. Fongs' property and were enforceable by the Sr. Fongs; (3) Defendants had "actual and constructive notice" of the restrictive covenants; (4) Defendants "deliberately and intentionally violated" the height and setback restrictions; (5) Defendants "chose to proceed at their own risk to their detriment"; and (6) [the Sr. Fongs] were "entitled to mandatory injunctive relief from Defendants' violations of the restrictive covenants."

The Sr. Fongs also sought an immediate injunction prohibiting further construction on the second story of Defendants' house and ordering removal of any portion of the house violating the height and setback restrictions. In addition, the Sr. Fongs requested a permanent injunction prohibiting the violation of the height and setback restrictions on Defendants' property.

On June 1, 1995, the Sr. Fongs moved for a temporary restraining order (TRO) enjoining anyone with notice of the TRO from "any further construction" on the second story of Defendants' home. On June 2, 1995, the court issued a TRO, effective for ten days, "in order to prevent further harm to [the Sr. Fongs], to preserve the status quo and the equities of the parties until a hearing may be held on [the Sr. Fongs'] Motion for Preliminary Injunction...."

On June 9, 1995, counsel for the Sr. Fongs and Defendants filed a written stipulation extending the TRO until the resolution of the case and agreeing to consolidate trial with the preliminary injunction hearing.

On June 19, 1995, Defendants filed their answer to the Sr. Fongs' complaint.

In their June 27, 1995 trial memorandum, Defendants argued that the restrictions on their lot were not enforceable by the Sr. Fongs because Fogarty conveyed Lot 5's title to the Sr. Fongs' predecessors in 1940, three years before the restrictions were included in Lot 11's deed. Defendants asserted that Fogarty could not have "create[d] a covenant in favor of land he no longer owned[,]" i.e., Lot 5.

On June 28, 1995, the Jr. Fongs filed a motion to intervene pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 24. The Jr. Fongs referred to Defendants' trial memorandum which "asserted a defense based on a purported defect in [the Sr. Fongs'] chain of title." Representing that their property also benefited from the height restriction on Defendants' lot, and that the Jr. Fongs had "an unbroken line [of title] to the grantor of [Defendants'] property[,]" the Jr. Fongs claimed that it was "necessary" for them to intervene because "their interest may not be protected by [the Sr. Fongs'] participation...." The Jr. Fongs also maintained that their intervention "w[ould] simplify the issues to be tried because their presence as parties plaintiff may obviate the need for the court to consider whether the restric-

---

**3.** Diamond Head is the "[w]orld-famous tuff crater that was formed on [the island of] O'ahu by violent steam explosions some 100,000 years ago." M.K. Pukui, S.H. Ebert, & E.T. Mookini, *Place Names of Hawaii* 24 (2d ed.1974).

**4.** Ewa is a "[p]lace name west of Honolulu, [Hawai'i,] used as a direction term." M.K. Pukui & S.H. Ebert, *Hawaiian Dictionary* 42 (6th ed.1986).

tions on [Defendants'] property were imposed as part of a common plan or scheme for subdivision of the surrounding properties."

Defendants opposed the Jr. Fongs' motion on the grounds of its "untimeliness and concomitant severe prejudice to Defendants" resulting from their "inability to conduct full discovery to adequately defend against [the Jr. Fongs'] claims." However, the court orally granted the Jr. Fongs' motion on June 29, 1995, and entered a written order to that effect on July 10, 1995.

On June 29, 1995, the Jr. Fongs filed a complaint seeking the same relief as the Sr. Fongs' complaint. The Jr. Fongs also represented that "[their lot] commands a panoramic view from both the first and second stories, from Diamond Head to the Ewa plains" and that "Defendants' two-story building, if permitted to remain, w[ould] severely interfere with and shut off the view from the [Jr.] Fongs' Lot, to their detriment." [5]

### 2.

At the conclusion of Plaintiffs' case, Defendants moved "for [a] directed verdict to dismiss in whole or in part [Plaintiffs'] case as to all or any part of the matter." The court "t[ook] [Defendants'] motion for directed verdict under advisement" and ordered Defendants to proceed with their case.[6]

The court entered its findings of fact (findings) and conclusions of law (conclusions) on August 1, 1995. The following findings are relevant to our disposition of this appeal:

6. *[Plaintiffs'] Lots 4 and 5 are situated at a higher elevation, mauka and directly across the road from [Defendants'] Lot 11.*

. . . .

9. *The 3 adjoining lots owned by the Kogamis [Lot 14], Shiromas [Lot 12], and Defendants [Lot 11] are makai of the private road and downslope of the lots owned by [Plaintiffs].*

10. *Only Lots 11, 12 and 14 in the Fogarty Subdivision[,] owned by the Kogamis, Shiromas and [Defendants], have a one-story height restriction in their deeds. ...*

11. The subdivision map filed with the City and County of Honolulu in 1938 clearly sets forth a building set back [sic] for the lots which abut the private road. However, no height restriction is indicated as to any lot on the subdivision map....

. . . .

19. Although Lots 4, 5 and 11 were all owned at one time by [Fogarty] or his heirs, *Lots 4 and 5 were transferred by Fogarty prior to the transfer of Defendants' Lot 11.*

The following conclusions are also relevant to our disposition:

4. *In order for [Plaintiffs] to be able to enforce the restriction, the restrictive covenant must run with the land and benefit their lots (Lots 4 and 5).*

. . . .

8. [The Sr. Fongs] derive their interest in Lot 5 through the April 4, 1940 conveyance from Fogarty. When Fogarty[7] conveyed [Defendants'] property in 1943 he no longer had any property interest in [the Sr. Fongs'] Lot 5. *Having no property interest*

5. We do not discern any answer in the record filed by Defendants–Appellees Muriel Y. Hashimoto and Susan M. Hashimoto, as Trustees of the Living Trust of Gerald S. Hashimoto and Muriel Y. Hashimoto dated October 13, 1992, and Susan M. Hashimoto, individually, (collectively referred to herein as Defendants) to the complaint filed by Intervening Plaintiffs–Appellants Dale S.N. Fong and Linda L. Fong (the Jr. Fongs). By the conduct of the parties and the first circuit court (the court), however, apparently all issues were joined in the matter for trial.

6. We note that Defendants' motion for a directed verdict should have been a motion to dismiss, as this was a jury-waived case. However, "[a] mo-

tion for a directed verdict [under Hawai'i Rules of Civil Procedure (HRCP) Rule 50(a) ] in a non-jury case will be treated as if it were a motion to dismiss under [HRCP] Rule 41(b)...." *Ontai v. Straub Clinic and Hospital*, 66 Haw. 237, 252, 659 P.2d 734, 745 (1983).

7. In its conclusions of law, the court erroneously referred to Edward P. Fogarty (Fogarty) as imposing the restrictions in the deed to Lot 11 and conveying that deed. In fact, the administrators of Fogarty's estate conveyed Lot 11 to Defendants' predecessors with the one-story and setback restrictions in the deed.

*in Lot 5, Fogarty could not burden Lot 11 with a height restriction for the benefit of Lot 5 which he no longer owned.*

9. *Therefore, the one-story restrictive covenant imposed by Fogarty in his deed to the De Canios does not benefit Lot 5, a lot in which he no longer had any interest, and [the Sr. Fongs] neither have the standing nor the right to enforce the restrictive covenant on Defendants' lot.*

10. [The Jr. Fongs] derive their interest in Lot 4 through the March 27, 1940 agreement of sale from Fogarty to the Austins.... [B]y the agreement of sale Fogarty transferred his equitable interest in Lot 4 to the Austins, retaining in himself the legal interest to Lot 4....

. . . .

13. *The Fogarty–Austin agreement of sale conveyed all of Fogarty's property interest in Lot 4 to the Austins in 1940. Fogarty thereafter had no more property interest in Lot 4. As a result, when Fogarty conveyed Lot 11 to the De Canios in 1943, he could not burden Lot 11 with a height restriction for the benefit of Lot 4 in which he had no property interest.* Fogarty neither had privity of estate with Lot 4 nor did he have any property interest in Lot 4 in favor of which he could burden Lot 11.

14. Therefore, the one-story restrictive covenant imposed by Fogarty in his deed to the De Canios does not benefit Lot 4, a lot in which he no longer had any interest, and *[the Jr. Fongs] neither have the stand-*

*ing nor the right to enforce the restrictive covenant on Defendants' lot.*

(Emphases added.)

On August 1, 1995, the court entered a "directed verdict" for Defendants and ordered that the June 2, 1995 TRO be dissolved.

On October 27, 1995, the court entered final judgment in favor of Defendants and against Plaintiffs. The court directed Plaintiffs to reimburse Defendants for costs in the amount of $5,621.88.[8]

On November 21, 1995, Plaintiffs filed their notice of appeal from the October 27, 1995 judgment and the August 1, 1995 findings, conclusions, and order.

## II.

■ Treating Defendants' motion for a directed verdict as a motion to dismiss, *see supra* note 6, we review the court's order granting Defendants' motion for an abuse of discretion. *See Hawaii Automotive Retail Gasoline Dealers Assn. v. Brodie*, 2 Haw. App. 99, 99, 626 P.2d 1173, 1174 (1981). Plaintiffs argue that the court erred in entering a "directed verdict" for Defendants because Plaintiffs are entitled to enforce the one-story height and fifteen-foot setback restrictions contained in the Fogarty Estate—De Canios deed based on three theories: (1) the Jr. Fongs may enforce the restrictions as real covenants running with the land; (2) Plaintiffs may enforce the restrictions as equitable servitudes; and (3) Plaintiffs may enforce the restrictions as third-party beneficiaries to the agreement creating the restrictions.[9]

---

8. On August 16, 1995, Defendants submitted a notice of taxation of costs, pursuant to HRCP Rule 54(d), for $8,823.59 in costs incurred in the case. After the Jr. Fongs and Plaintiffs–Appellants Leonard K.K. Fong and Ellen Lee Fong (the Sr. Fongs) filed their opposition memorandum, the court denied $3,201.71 in expert fees but approved $5,621.88 in total costs for Defendants. On January 4, 1996, Defendants filed a partial satisfaction and release of judgment as to the cost portion of the October 27, 1995 judgment.

9. The court did not make findings on the equitable servitude and third-party beneficiary theories advanced by the Jr. Fongs and the Sr. Fongs (collectively referred to herein as Plaintiffs). Defendants assert in their answering brief that the lack of findings on these theories stems from

Plaintiffs' absence of proof on them. Plaintiffs have argued both that we may make our own findings with respect to those theories from the "uncontradicted evidence" in the record, and that we should vacate the judgment and remand the case for additional findings because of the court's "fail[ure] to make appropriate findings as to material issues[.]"

We agree with Plaintiffs' former contention, because where the evidence is uncontradicted, we will consider issues on which the court did not make specific findings. *See Molokoa Village Dev. Co. v. Kauai Elec. Co.*, 60 Haw. 582, 593, 593 P.2d 375, 382 (1979) ("In considering [the appellant's] contention, [the supreme court is] not confined to the trial court's express findings of fact and may also take into consideration the

Defendants assert that this court "does not have jurisdiction to adjudicate the merits of this appeal" because Plaintiffs do not have "standing to enforce the covenants on Lot 11" under any of the above theories. Defendants apparently base this contention on the fact that the restrictions on Lot 11 were imposed after Fogarty executed an agreement to sell Lot 4 to the Jr. Fongs' predecessors and conveyed the deed to Lot 5 to the Sr. Fongs' predecessors. For the reasons set forth herein, we do not believe that this fact bars the Jr. Fongs from enforcing the restrictions as real covenants or the Plaintiffs from enforcing the restrictions as equitable servitudes.

We first address Plaintiffs' arguments with respect to the Jr. Fongs' right to enforce the restrictions as real covenants.[10]

### III.

"A covenant . . . is an agreement by one person, the covenantor, to do or refrain from doing something enforceable by another person, the covenantee." *Waikiki Malia Hotel,* 75 Haw. at 382, 862 P.2d at 1056. "Land use covenants create rights and duties between the original promising parties. The covenantee's rights are called the 'benefit' of the covenant, while the covenantor's duties are called the 'burden.' " 9 R. Powell, *Powell on Real Property* § 60.01[2], at 60–5–6 (1997 rev.).

"If certain requirements are met, either the benefit or the burden is capable of devolving on a successor to the property interest of either the covenantor or the covenantee. Where the benefit and the burden devolve, it is said that the covenant 'runs with the land.' " *Id.* In our jurisdiction, there are three requirements for a covenant to run with the land: "(1) it must 'touch

and concern' the land; (2) the covenanting parties must intend it to run with the land; and (3) there must be privity of estate." *Waikiki Malia Hotel,* 75 Haw. at 383, 862 P.2d at 1057 (citing *Flying Diamond Oil Corp. v. Newton Sheep Co.,* 776 P.2d 618, 623 (Utah 1989)).

In this case, the De Canios agreed to covenants contained in the deed to Lot 11, by virtue of which the De Canios promised the Fogarty Estate that they would not build structures more than one story in height on their lot nor within fifteen feet of the twenty-foot-wide portion of the road through the subdivision. These covenants were enforceable by the Fogarty Estate, and also by its successors in interest if the above three requirements were met. A successor in interest who desires to enforce the covenant "has the burden to prove the parties' clear intention to create a covenant that would run with the land." *Waikiki Malia Hotel,* 75 Haw. at 382, 862 P.2d at 1057. Thus, we address whether the Jr. Fongs satisfied their burden of proof on each of the three requirements.

### A.

In *Waikiki Malia Hotel,* the supreme court concluded that the height restriction at issue in that case "clearly" satisfied the touch and concern element "because it relate[d] to the use of the land and the ownership interest in it. For a covenant to run with the land, it must extend to the land so that the condition required to be performed affects the quality or value of the land." *Id.* at 384, 862 P.2d at 1057. The supreme court determined that the height restriction touched and concerned the burdened land because it diminished the value of the land by limiting what could be built on the land. *Id.; see also* 9 R. Powell, *Powell*

uncontradicted evidence contained in the record."); *Associated Engineers & Contractors v. State,* 58 Haw. 187, 194, 567 P.2d 397, 404 (holding that when the record is "sufficiently clear" the reviewing court "do[es] not need the aid of additional findings"), *reh'g denied,* 58 Haw. 322, 568 P.2d 512 (1977); *Richards v. Kailua Auto Mach. Serv.,* 10 Haw.App. 613, 621, 880 P.2d 1233, 1238 (1994) ("In cases where the record is so clear that the court does not need the aid of findings it may waive such a defect on the ground that the error is not substantial in the

particular case." (quoting *Lalakea v. Baker,* 43 Haw. 321, 329 (1959))).

10. At oral argument before this court, Plaintiffs' counsel represented that, because the Sr. Fongs' predecessors purchased Lot 5 before the restrictions were placed in Lot 11's deed, Plaintiffs were not pursuing their original argument that the Sr. Fongs could enforce the restrictions as restrictive covenants.

*on Real Property* § 60.04[2], at 60–47 (1997 rev.) ("[I]f the covenantor's legal interest in land is rendered less valuable by the covenant's performance, then the burden of the covenant satisfies the requirement that the covenant touch and concern land."). As in *Waikiki Malia Hotel,* we believe it is clear that the burden of the covenants here touched and concerned the De Canios' land because they restricted the height and location of the structures built on the land, thus decreasing its value. Hence the height and setback covenants satisfied the touch and concern requirement.[11]

### B.

### 1.

To determine whether the covenanting parties intended the covenant to run with the land, the language of the deed is examined. *Waikiki Malia Hotel,* 75 Haw. at 384, 862 P.2d at 1057–58. In *Waikiki Malia Hotel,* the covenant in the deed "specifically state[d] that 'Grantee . . . covenants and agrees with [Grantor], *its successors and assigns,*' and that '[t]his covenant . . . shall be binding upon the property, including without limitation, all owners, lessees, licensees, grantees, assigns, and transferees thereof[.]'" *Id.* at 386, 862 P.2d at 1058 (some brackets added and footnotes omitted) (emphasis in original). The use of the words "successors and assigns" after the covenantee's name in the portion of the deed creating the covenant, the supreme court concluded,

was evidence of an intent to create a covenant running with the land. *Id.*

As set forth previously, the Fogarty Estate—De Canios deed provided that "the Grantees . . . covenant and agree with the Grantors *and their successors and assigns*" to abide by the height and setback restrictions.[12] (Emphasis added.) Therefore, the language of the deed here also supports the conclusion that the original covenanting parties intended the restrictions to run with the land.

In fact, the Fogarty Estate—De Canios deed explicitly stated that "the foregoing covenants *shall run with the land* hereby conveyed" to the De Canios. (Emphasis added.) Although the deed in *Waikiki Malia Hotel* also stated that the covenant "shall run with the land," the supreme court held that the covenant was "ambiguous" to the extent that it "d[id] not indicate who or what was intended as the beneficiary of the imposed height restriction." *Waikiki Malia Hotel,* 75 Haw. at 384–85, 862 P.2d at 1058. Similarly, the height and setback covenants in the Fogarty Estate—De Canios deed did not indicate an intended beneficiary.

However, the absence of an intended beneficiary in the covenant itself does not preclude the covenant from running with the land. *See Rodgers v. Reimann,* 227 Or. 62, 361 P.2d 101, 103 (1961) (observing that "the intention to benefit a particular parcel of land through the imposition of the restrictions on the land conveyed need not be expressly recited in the contract or deed"). When

11. In *Waikiki Malia Hotel v. Kinkai Properties Ltd. Partnership,* 75 Haw. 370, 384, 862 P.2d 1048, 1057 (1993), the supreme court observed only that the burden of the height restriction touched and concerned the burdened land, but did not address whether the benefit of the restriction touched and concerned the benefited land nor whether proof of such was required. According to 9 R. Powell, *Powell on Real Property* § 60.04[2], at 60–48 (1997 rev.) (footnote omitted), "the touch and concern requirement is applied separately to the burden and the benefit of a covenant." The benefit touches and concerns the land "[i]f . . . the covenantee's legal interest in [the] land is rendered more valuable by the covenant's performance." *Id.* at 60–47. Although the parties do not present argument on this point, we believe that a height restriction protecting the view from the covenantee's land

would render that land more valuable, and thus the benefit of the covenant would touch and concern the covenantee's land. In fact, Defendants' expert, James Reinhardt (Reinhardt), agreed with Plaintiffs' counsel that "the value of lots 2 through 5 is enhanced by the one-story height restriction on lots 11, 12[,] and 14[.]"

12. Defendants point out that the subsequent deed from the De Canios to the Mendoncas provided that the grantees "covenant and agree with the Grantors, and *their heirs, executors and administrators . . . .*" (Emphasis added). Because the height and setback restrictions were not created in this deed, and thus the De Canios and the Mendoncas were not the original covenanting parties, their deed is irrelevant to determining the original covenanting parties' intent.

there is an ambiguity in the covenant, even as to the intended beneficiary, "extrinsic evidence" of intent may be considered. *Waikiki Malia Hotel*, 75 Haw. at 385, 862 P.2d at 1058.

### 2.

To resolve the ambiguity as to the intended beneficiary of the covenant in *Waikiki Malia Hotel*, the supreme court "look[ed] to the circumstances surrounding the creation of the covenant. The use of surrounding circumstances, also known as extrinsic evidence, 'usually concerns the geographical location of the lands and the physical condition of the structures thereon.'" *Id.* at 385, 862 P.2d at 1058 (quoting 2 *Amer. Law of Prop.* § 9.29, at 417 (1952)). In that case, the supreme court looked to the relationship between the burdened lot, Lot 48, and an adjacent lot, Lot 269. *Id.* The deed to Lot 48 contained a forty-five-foot height restriction, and the supreme court noted that "[i]nterestingly, the hotel rooms with views on adjacent Lot 269 begin at approximately the forty-five foot level." *Id.; see also Snow v. Van Dam*, 291 Mass. 477, 197 N.E. 224, 226 (1935) ("In the absence of [an] express statement, an intention that a restriction upon one lot shall be appurtenant[13] to a neighboring lot is sometimes inferred from the relation of the lots to each other.").

■■■ Considering the "geographical location" of the lots and the topography of the subdivision, it appears obvious that the one-story height restriction on Lot 11 was intended to protect the views from the upslope lots, including Lot 4. First, despite Defendants' contention that "if Fogarty were concerned with protecting mauka lot views, logically he would have imposed specific height limitations rather than ambiguous one-story restrictions," the supreme court has stated, in a case dealing with a one-and-one-half-story restriction, that "[t]here is no question that restrictive covenants limiting the height of homes are enforceable for the purpose of protecting a view." *Sandstrom v. Larsen*, 59 Haw. 491, 496 n. 3, 583 P.2d 971, 976 n. 3 (1978). In *Sandstrom*, the supreme court

upheld the trial court's finding "that the purpose of the [one-and-one-half-story] height restriction was to protect the view and privacy" of other homeowners, characterizing such an interpretation of the restriction as "entirely reasonable." *Id.* at 496, 583 P.2d at 976. The height restriction at issue in *Waikiki Malia Hotel* was also found to be for the purpose of protecting the views from hotel rooms on the adjacent lot. *Waikiki Malia Hotel*, 75 Haw. at 385, 862 P.2d at 1058.

The evidence in this case also demonstrates that the objective of the height restrictions on Lots 11, 12, and 14 was to protect the views from Lots 3, 4, and 5. It is not disputed that, as the court found, Lots 11, 12, and 14 are across the street and downslope of Lots 4 and 5. Plaintiffs' expert witness, Fritz Johnson (Johnson), testified that "the uphill lots would all be somewhat affected by what was built on the lower lots in relation to the topography." Although noting that the house on Lot 11 "is directly in front of Lot 5," Johnson observed that because Lot 4 is at a slightly lower elevation than Lot 5, "the impact of the two stories structure [sic] on Lot 4 even becomes more critical because the house [on Lot 11] becomes more imposing." Johnson represented that the view obstructed from Lot 4 was "not a direct view directly in front of the property [but] ... towards the city scape, the ocean, and towards the Diamond Head view."

Johnson also opined that the same one-story height restrictions on Lots 11, 12, and 14 were imposed "to protect the views, the privacy and the open space in the design concept of the subdivision." When questioned on cross-examination, Defendants' expert witness, James Reinhardt (Reinhardt), admitted too that protecting the views of the upslope lots was a "likely reason" for the same height restrictions on Lots 11, 12, and 14; in his deposition, Reinhardt agreed that it was "probably" the "most likely reason."

With respect to the fifteen-foot setback restriction, Johnson testified that the intent of this restriction would be "to open up visu-

---

**13.** "A thing is deemed to be incidental or *appurtenant* to land when it is by right used with the

land for its benefit...." *Black's Law Dictionary* 103 (6th ed.1990) (emphasis in original).

ally that space in between so it doesn't feel so crowded.... [I]t opens up the property." Defendants do not appear to refute this contention.[14]

Thus, the topography of the subdivision leads to the conclusion that the same height restrictions on Lots 11, 12, and 14 were intended to benefit the upslope owners of Lots 3, 4, and 5, and the setback restrictions were intended to benefit all lots.

3.

■ Ownership of the burdened and benefited land by a common grantor at the time a covenant was created is another extrinsic factor that has been used to resolve any ambiguity as to the intended beneficiary of the covenant. *Waikiki Malia Hotel,* 75 Haw. at 385, 862 P.2d at 1058.

a.

■ Defendants maintain that Lot 4 could not be the intended beneficiary of the restrictive covenants imposed on Lot 11 because the March 27, 1940 agreement of sale for Lot 4 executed by Fogarty meant that Fogarty's estate "no longer had an interest in [the Jr. Fongs'] propert[y] upon which to confer a benefit" when the estate imposed restrictions in the June 26, 1943 deed to Lot 11. Defendants argue that when Fogarty and the Austins executed an agreement of sale for Lot 4, "all of Fogarty's equitable and beneficial property interests in Lot 4 vested in the Austins" and thus neither he nor his estate had any "beneficial interest" in Lot 4 for which "to confer the benefit of any restrictions" placed on Lot 11. In our view, the court erred in accepting this argument

and concluding that the Jr. Fongs did not have "the standing nor the right" to enforce the height and setback covenants.

b.

An agreement of sale is defined as "an executory contract which binds the vendor to sell and the vendee to buy the realty [or the estate therein] which constitutes the subject matter of the transaction." *Bank of Hawaii v. Horwoth,* 71 Haw. 204, 211, 787 P.2d 674, 678 (1990) (internal quotation marks and citation omitted). Our supreme court has accepted the doctrine of equitable conversion as applied to contracts for the sale of land, holding that:

> [u]nder an agreement of sale, *the legal title to the property remains in the seller,* but upon the execution and delivery of the agreement of sale, there accrues to the [purchaser] an equitable interest in the land. The legal title is retained by the [seller] essentially as security for the payment by the [purchaser] of the purchase price.[15]

*Id.* at 211, 787 P.2d at 678–79 (internal quotation marks and citations omitted) (emphasis added).

■ While the "essential[ ]" purpose of retaining legal title is to secure "payment by the [purchaser] of the purchase price[,]" *id.,* legal title held by the vendor is relevant for other purposes. For example, a vendor's written consent to a transfer of the property is required as long as the vendor retains legal title. *Jenkins v. Wise,* 58 Haw. 592, 599, 574 P.2d 1337, 1342 (1978). A vendor with legal title may also maintain an action "to quiet title [to the land conveyed] or [to]

14. In any event, Reinhardt agreed that the fifteen-foot setback restrictions "were imposed as part of the common plan or scheme for the subdivision[,]" rendering them enforceable as equitable servitudes by any lot owner in the subdivision, as discussed *infra* part IV.

15. Under the doctrine of equitable conversion,

> *[t]he vendee* is looked upon and treated as *the owner of the land;* an equitable estate has vested in him [or her] commensurate with that provided by the contract, whether in fee, for life, or for years....
>
> *The equitable interest of the vendor* is correlative with that of the vendee; his [or her] bene-

> ficial interest *in the land* is gone, and only the naked legal title remains, which he [or she] holds in trust for the vendee, accompanied, however, by a lien upon the land as security when any of the purchase price remains unpaid. This lien, like every other equitable lien, is not an interest *in the land,* is neither a *jus ad rem* nor a *jus in re,* but merely an encumbrance.

*Bank of Hawaii v. Horwoth,* 71 Haw. 204, 212 n. 8, 787 P.2d 674, 679 n. 8 (1990) (quoting 2 J. Pomeroy, *Equity Jurisprudence* § 368, at 21, 24 (5th ed.1941) (emphasis in original)).

remove a cloud therefrom." *Kern v. Robertson*, 92 Mont. 283, 12 P.2d 565, 568 (1932). So long as a vendor retains legal title, the vendor may impose restrictions on property subject to a land sale contract, *Kotesky v. Davis*, 355 Mich. 536, 94 N.W.2d 796, 798 (1959), and enforce restrictions on the use of such property, *Baxter v. Ogooshevitz*, 205 Mich. 249, 171 N.W. 385, 388 (1919); *cf. Storey v. Brush*, 256 Mass. 101, 152 N.E. 225, 226 (1926) (concluding that vendors who held mortgages on certain parcels to secure unpaid purchase money had an interest in enforcing restrictions on those parcels). Thus, we discern no meaningful reason to conclude that because legal title is retained essentially to secure payment of the purchase price under an agreement of sale, a vendor's legal title would not be a sufficient interest to support the vendor's imposition of restrictive covenants on other land for the benefit of the land subject to the agreement of sale.

It has been indicated that restrictive covenants run only with legal title. The Wyoming Supreme Court determined that the vendee under a contract for deed,[16] holding equitable title to the property, "could *not* impose restrictive covenants that would run with the land." *Streets v. J M Land & Dev. Co.*, 898 P.2d 377, 379 (Wyo.1995) (emphasis added).[17] The dissenting justice in *Streets*, agreeing with the majority on that point, explained that

> "[i]t is ... a general principle that covenants run only with the legal title to lands and tenements, as distinguished from the equitable title." Since [the vendee holding equitable title] was the only party who signed the restrictive covenants and it did not have legal title to the property, the covenants were not effective.

*Id.* at 381 (quoting 20 Am.Jur.2d *Covenants, Conditions, and Restrictions* § 33, at 604

(1965)). Thus, it may be implied that restrictive covenants imposed by a vendor with legal title would be effective.

 We believe that the policies underlying equitable conversion provide further support for our conclusion. The separation of legal and equitable interests under an agreement of sale is said to stem from the proposition that " 'equity regards and treats as done what ought to be done.' " *Horwoth*, 71 Haw. at 211, 787 P.2d at 679 (quoting 2 J. Pomeroy, *Equity Jurisprudence* § 368, at 21 (5th ed.1941)). Hence, there is wide agreement that equitable conversion is not to be applied where it will produce inequitable results. *See Atkinson v. Van Echaute*, 236 Ark. 423, 366 S.W.2d 273, 274 (1963) ("The purpose of the doctrine of equitable conversion is to give effect to the intention of the testator, settlor, or contracting parties, and [the doctrine] will not be given an effect contrary to such intention."); *Mullins v. Evans*, 43 Tenn.App. 330, 308 S.W.2d 494, 498 ("The intention of the parties is the polestar controlling the question of equitable conversion ...."), *cert. denied*, 308 S.W.2d 494 (Tenn.1957); *Clay v. Landreth*, 187 Va. 169, 45 S.E.2d 875, 877 (1948) ("[Equitable conversion] ... is limited in its application to cases where the enforcement of the contract is in accord with the intention of the parties ... and where it will not produce inequitable results."); *see also Coe v. Hays*, 328 Md. 350, 614 A.2d 576, 579 (1992) (reaffirming that equitable conversion "is not a fixed rule of law, but proceeds upon equitable principles which take into account the result which its applications will accomplish") (internal quotation marks and citation omitted); *Union Guardian Trust Co. v. Rood*, 261 Mich. 188, 246 N.W. 74, 75 (1933) (refusing to apply equitable conversion where doing so "would accomplish a decidedly inequitable result").

*Black's Law Dictionary* 879 (6th ed.1990).

---

**16.** A contract for deed is another term for a land sale contract, which is defined as a

> [a] contract for the purchase and sale of land upon execution of which title is transferred. [The t]erm commonly refers to an installment contract for the sale of land whereby [the] purchaser (vendee) receives the deed from the owner (vendor) upon payment of final installment. The vendor retains legal title to the property (deed) as security for payment of contract price.

**17.** The Wyoming Supreme Court held, however, that "a restrictive covenant imposed by the equitable owner of land can be enforced in an equitable action against a purchaser of land chargeable with notice of the restrictive covenant." *Streets v. J M Land & Dev. Co.*, 898 P.2d 377, 379 (Wyo.1995).

As we have discussed, the intention of Fogarty and his estate to benefit the upslope lots, including Lot 4, by imposing height restrictions on the downslope lots, including Lot 11, is evident. It is not disputed that the setback restrictions were intended to benefit all lots. To frustrate this intent through strict adherence to equitable conversion in this case would be contrary to the settled principles used in applying that doctrine. Furthermore, Pomeroy has observed that "[i]t follows, ... as a necessary consequence [of equitable conversion], that the vendee is entitled to any improvement or increment in the value of the land after the conclusion of the contract...." 2 J. Pomeroy, *Equity Jurisprudence* § 368, at 24 (5th ed.1941). By placing a one-story restriction on Lot 11 to benefit, among others, Lot 4, and a setback restriction which benefits all lot owners, the Fogarty Estate improved the value of Lot 4 after the agreement of sale was executed. Therefore, denying Lot 4 the benefit of the restrictions on Lot 11 would produce inequitable results.

### c.

Thus, we disagree with Defendants' contention that the doctrine of equitable conversion, as applied to the agreement of sale for Lot 4, operated to eliminate Fogarty's interest in Lot 4 to such an extent that his estate could not impose the restrictions on Lot 11 for the benefit of Lot 4.

### 4.

We therefore conclude that there was substantial evidence which "strongly implicate[d]" an intent by the Fogarty Estate to have the burdens of the restrictions run with Lot 11 and the benefits run with Lot 4. *Waikiki Malia Hotel,* 75 Haw. at 385, 862 P.2d at 1058.

### C.

Privity of estate is the third requirement for a covenant to run with the land. Three types of privity exist:

(1) mutual, i.e, a covenant arising from simultaneous interests in the same land;

(2) horizontal, i.e., a covenant created in connection with a conveyance of an estate from one of the parties to another;

(3) vertical, i.e., the devolution of an estate burdened or benefitted by a covenant from an original covenanting party to a successor.

*Waikiki Malia Hotel,* 75 Haw. at 386–87, 862 P.2d at 1058 (quoting *Flying Diamond Oil,* 776 P.2d at 628). The supreme court did not specify which of the three types of privity are required to enable a covenant to run with the land. In *Waikiki Malia Hotel,* only vertical privity was defined further and deemed to have been satisfied with respect to the burdened land. *Id.* at 387, 862 P.2d at 1058.

Few states require mutual privity, and such a requirement has been strongly criticized. *See* 9 R. Powell, *Powell on Real Property* § 60.04[2], at 60–64–65 (1997 rev.). Hence, we see no reason for adopting a requirement of mutual privity.

Horizontal privity is satisfied "when the original covenanting parties make their covenant in connection with the conveyance of an estate in fee from one of the parties to the other." *Id.* at 60–65. Horizontal privity has also been criticized, although it appears to be required in a number of states. *See id.* at 60–65–66. While observing that horizontal privity was satisfied in this case, because the restrictions were created in the deed conveying Lot 11, we need not decide whether horizontal privity is required for a covenant to run with the land in all cases.

"[Vertical privity] arises when the person presently claiming the benefit, or being subjected to the burden, is a successor to the estate of the original person so benefited or burdened." *Waikiki Malia Hotel,* 75 Haw. at 387, 862 P.2d at 1058 (internal quotation marks and citations omitted). Hence, if the person currently "being subjected to the burden" is not the original burdened party, the former must be a "successor to the estate" of the latter in order for vertical privity to exist. It is apparently conceded that vertical privity exists between the De Canios, whose deed to Lot 11 included the height and setback restrictions, and Defendants, who are the De Canios' successors to Lot 11.

In *Waikiki Malia Hotel* the supreme court addressed only the question of whether there was vertical privity with respect to the burdened parcel, perhaps because it held that the person presently claiming the benefit no longer had an interest in the benefited property. It is apparent from the definition of vertical privity, however, that for the vertical privity requirement to be satisfied in a situation where the "person presently claiming the benefit" is not the original benefited party, then the former must demonstrate that he or she is a "successor to the estate" of the latter. In other words, when neither the person presently claiming the benefit nor the current allegedly burdened party are the original covenanting parties, vertical privity must be satisfied with respect to both the benefit and the burden.

Defendants claim that the Jr. Fongs have no right to enforce the restrictive covenants because the Jr. Fongs are not in vertical privity with the Fogarty Estate. This contention is again based on the fact that Fogarty executed an agreement of sale for Lot 4 prior to the time when his estate imposed the restrictions on Lot 11. Because Fogarty did not retain any interest in Lot 4 on which to confer the benefit of Lot 11's restrictions, Defendants argue, Lot 4 was not the parcel which was originally benefited by the covenants and thus vertical privity does not exist between the Jr. Fongs, the parties currently seeking the benefit, and the Fogarty Estate, "the original entity which benefited from the [Lot 11] restrictions."

As we have discussed, we believe the record supports the conclusion that Lot 4 was in fact one of the parcels originally benefited by the restrictions imposed in the deed to Lot 11. The Jr. Fongs are successors to the estate of the Austins and the Ais, who were the original parties on Lot 4 who benefited by the restrictions. We therefore agree with Plaintiffs that vertical privity existed between the Jr. Fongs and the Ais, such as to allow the Jr. Fongs to enforce the covenants running with the land.

## D.

Because we conclude that the three requirements for covenants to run with the land were satisfied here with respect to the Jr. Fongs, the Jr. Fongs were entitled to enforce the restrictive covenants concerning the height and setback of Defendants' home on Lot 11.

## IV.

We next consider Plaintiffs' alternative arguments concerning their right to enforce the height and setback restrictions under an equitable servitude theory, and we conclude that all Plaintiffs may enforce the restrictions under this theory.

## A.

Equitable servitudes are "equitable property interest[s] in the burdened land, appurtenant to the benefited land" and are essentially covenants enforceable in equity. 9 R. Powell, *Powell on Real Property* § 60.01[2], at 60–9–10 (1997 rev.). Plaintiffs have argued that "the deed restrictions constitute equitable servitudes which burden ... Lot 11 and are enforceable by all owners in the Fogarty Subdivision, including [Plaintiffs], *because of the common plan or scheme.*" (Emphasis added.)

A common plan or scheme of development would be significant for two purposes. First, "the existence of a general scheme may be shown ... for the purpose of determining the land to which express restrictions are appurtenant. If the plaintiff shows the general scheme and if his [or her] lot and that [lot] sought to be bound were a part of the plan, he [or she] receives the benefit of the plan." *Waterhouse v. Capital Inv. Co.,* 44 Haw. 235, 243, 353 P.2d 1007, 1013 (1960) (citing *Snow,* 197 N.E. at 227). In this case, there were express restrictions placed on Lot 11 and thus evidence of a common scheme including all of the parties' lots would allow Plaintiffs to receive the benefit of the plan by enforcing the restrictions.

Second, common schemes may be used "to enable the restrictions to be made appurtenant to a lot within the scheme which has been earlier conveyed by the common vendor." *Snow,* 197 N.E. at 228. The Massachusetts court recognized that "an earlier

purchaser in a land development has long been allowed to enforce against a later purchaser the restrictions imposed upon the latter by the deed to him [or her] in pursuance of a scheme of restrictions." *Id.* As explained by the Oregon Supreme Court,

> Where the restrictions [imposed on subsequent purchasers] are part of a general building plan the courts generally recognize that a prior purchaser from the covenantee can enforce the covenants subsequently entered into between his [or her] grantor and subsequent grantees. If the covenants touch and concern the land previously conveyed out of an area subdivided pursuant to a general building plan, it is ordinarily held that in the absence of evidence of a contrary intent it will be assumed that the parties intended to benefit such land.

*Rodgers,* 361 P.2d at 103–04 (citations omitted).

It has been said that "[w]hen there is a general scheme of development embracing the lots of both prior and subsequent purchasers, restrictive covenants, especially when carried in all deeds, *inure to the benefits of each purchaser irrespective of the time of purchase, so long as the purchase does not antedate the establishment of the plan....*" Annotation, *Who May Enforce Restrictive Covenant or Agreement as to Use of Real Property,* 51 A.L.R.3d 556, 589 (1973) (footnotes omitted) (emphasis added). *See also Snow,* 197 N.E. at 226 ("In England, where the idea [of a common scheme] has been

most fully developed, it is established that the area covered by the scheme and the restrictions imposed within that area must be apparent to the several purchasers when the sales begin.").

However, many courts allow the vendee to present proof of "actual *subsequent* development as evidence of the existence of the original common plan" to show that a common scheme existed at the time a vendee purchased his or her lot. 9 R. Powell, *Powell on Real Property* § 60.03, at 60–36 (1997 rev.) (emphasis added). For example, in *Snow,* the Massachusetts court stated that "a 'scheme' has legal effect if definitely settled by the common vendor when the sale of lots begins, *even though at that time evidence of such settlement is lacking and a series of subsequent conveyances is needed to supply it.*" *Snow,* 197 N.E. at 227 (emphasis added). "[T]he criterion in this class of cases is the intent of the grantor in imposing the restrictions.'" *Id.* (quoting *Bacon v. Sandberg,* 179 Mass. 396, 60 N.E. 936, 937 (1901)).

*Waterhouse* is the only case in our jurisdiction that has addressed the issues of equitable servitudes and common plans.[18] In that case, the Hawai'i Supreme Court noted the problem of purchasers whose lots were sold before certain restrictions were imposed: "As stated by the Massachusetts court in *Snow,* it is difficult to see how a lot already granted takes the benefit of restrictions later imposed unless such benefit was promised the grantee of the first lot at the time of his [or her] conveyance."[19] *Id.* at 243–44, 353

---

18. It is evident that, in *Waterhouse v. Capital Inv. Co.,* 44 Haw. 235, 353 P.2d 1007 (1960), the supreme court was presented with a different factual situation than at issue here. The plaintiff in *Waterhouse* alleged that he purchased his lots from a vendor who inserted structure and use restrictions in the deeds to all lots in the subdivision except the defendants' lot. *Id.* at 236–38, 353 P.2d at 1010–11. The defendants' lot was the last lot in the subdivision conveyed by the vendor. *Id.* at 238, 353 P.2d at 1011. The plaintiff "[sought] to imply the burden [of the restrictions] on the [defendants' lot] and the benefit to [the plaintiff] as a landowner in that area[,]" basing his claim "upon a general scheme or plan to burden land in the ... subdivision by the imposition of restrictions for the mutual benefit of landowners in that area." *Id.* at 241–42, 353 P.2d at 1012–13. In doing so, the plaintiff "relie[d] on the doctrine on implied reciprocal

negative easements": "Where there is no express restriction in the chain of title of the particular lot the use of which is sought to be restricted, there must be proof of a 'scheme of restrictions' originating from a common owner." *Id.* at 242, 353 P.2d at 1013 (quoting *Denhardt v. De Roo,* 295 Mich. 223, 294 N.W. 163 (1940)).

Thus, in *Waterhouse,* the plaintiff was asking the court to *impose* restrictions on the defendants' lot on the basis of a general plan of restrictions in the subdivision, whereas Plaintiffs here have sought the right to *enforce* restrictions already expressly imposed on Defendants' lot by the parties' common grantor.

19. We note that even in the absence of a common plan, some courts have recognized "implied reciprocal servitudes" as a means for prior purchasers to enforce restrictions imposed by a common grantor on subsequent conveyances:

P.2d at 1013. The supreme court did not discuss the applicability of common plans to show that the benefit of the restrictions inured to prior purchasers, perhaps because of the different factual situation in *Waterhouse.*

### B.

Examining the deeds of the lots in the subdivision and the subdivision plat map, it is evident that Fogarty and his estate intended that a common plan be imposed on the subdivision. Fifteen-foot setback restrictions were imposed in the deeds to seven of the lots around the hammer-shaped road, including Lots 4, 5, and 11. The lots with the fifteen-foot setback restrictions are the four mauka lots and three of the four makai lots which face each other across the road.[20] The court found that the "subdivision map filed with the City and County of Honolulu in 1938 clearly sets forth a building set back [sic] for the lots which abut the private road." As we have recounted, Defendants' expert, Reinhardt, in fact admitted that the setback restrictions were part of a common scheme in the subdivision. It is thus undisputed that a common scheme of setback restrictions existed, which included Plaintiffs' lots and Lot 11.

This common scheme was "definitely settled" when Fogarty began conveying the lots in the subdivision with the sale of Lot 5, as evidenced by the "series of subsequent conveyances" containing the same setback restrictions in the deeds. *See Snow,* 197 N.E.

at 227. Hence, the setback restrictions "inure[d] to the benefits of each purchaser irrespective of the time of purchase," including the Jr. and Sr. Fongs, *see* Annotation, *Who May Enforce Restrictive Covenant or Agreement as to Use of Real Property,* 51 A.L.R.3d 556, 589 (1973) (footnotes omitted), and all Plaintiffs may enforce the fifteen-foot setback restriction on Lot 11.

### C.

Based on the facts of this case, we also believe that the height restrictions on Lots 11, 12, and 14 were part of the common plan for the Fogarty Subdivision.

### 1.

 Arguing that there was no common scheme of one-story restrictions, Defendants place great weight on the fact that only three of the lots in the subdivision were burdened with such restrictions. The absence of a restriction on certain lots, however, is not dispositive to the issue of whether there was a common scheme or plan. "The test of whether [a common plan of development exists] is 'whether substantial common restrictions apply to *all lots of like character or similarly situated.*'" *Constant v. Hodges,* 292 Ark. 439, 730 S.W.2d 892, 894–95 (1987) (quoting *Jones v. Cook,* 271 Ark. 870, 611 S.W.2d 506, 506 (1981)) (emphasis added).

The evidence demonstrated that Lots 11, 12, and 14 are "lots of like character" in the

[W]hen the prior purchaser acquires his [or her] land in expectation that he [or she] will be entitled to the benefit of subsequently created servitudes, there immediately arises an implied reciprocal servitude against the common grantor's remaining land. If so, then [the prior purchaser] is enforcing, not the express agreement made by the common grantor when he [or she] subsequently sells his [or her] remaining land, but this implied reciprocal servitude created by implication at the time of the conveyance to the prior purchaser.

. . . .

To establish a reciprocal servitude it is necessary to find that the prior grantee purchased his [or her] land in reliance upon his [or her] grantor's promise to impose restrictions upon the retained parcels when conveyed by the common grantor to subsequent purchasers.

*Rodgers v. Reimann,* 227 Or. 62, 361 P.2d 101, 104 (1961) (internal quotation marks and citations omitted); *see also Waterhouse,* 44 Haw. at

244, 353 P.2d at 1014 ("Under the Massachusetts rule, as stated in *Snow v. Van Dam,* 291 Mass. 477, 197 N.E. 224 (1935), restrictions between the vendor and the vendee can be enforced only where . . . the vendor binds his [or her] remaining land by writing[.] . . . We find this rule too restrictive. *The [p]laintiff's claim may be grounded in an implied promise to bind the remaining land.*") (emphasis added) (internal quotations omitted). Because Plaintiffs have not advanced this type of servitude argument, we need not address its merits in this case.

20. The December 1938 subdivision map filed with the City and County of Honolulu indicated that a fifteen-foot setback restriction would be imposed on Lot 15, the fourth makai lot. However, no such restriction appears to have been included in the deed for Lot 15 conveyed by the administrators of Fogarty's estate. The record does not explain this apparent omission.

subdivision which are "similarly situated." *Id.* Lots 11, 12, 14, and 15 are the only downsloping lots abutting the makai side of the hammer-shaped road. Johnson testified that the slope from the road to the bottom of the property on Lots 11, 12, and 14 is approximately twelve percent, and the slope on Lot 15 is somewhat less. Although Lots 7 through 10 are also downsloping properties situated along the road, they are located at the end of the hammerhead portion, and Johnson testified that those properties are "quite steep" such that they could "almost be considered cliff houses [be]cause the property drops off dramatically into the valley." Thus, from a topographical standpoint, Lots 11, 12, and 14 are "similarly situated" along the makai side of the road, and have similar slopes as to make them "of like character." *Constant,* 730 S.W.2d at 894–95. The most likely purpose of the one-story restriction imposed on Lots 11, 12, and 14 was to protect the views of the upslope lot owners, as the parties' expert witnesses agreed. The topography of those lots supports the conclusion that the same one-story restriction in the deeds to these lots evidences a common plan of height restrictions for the subdivision.

2.

Because the other lots in the subdivision were not "of like character" as Lots 11, 12, and 14, the absence of any height restrictions on the other lots is understandable. In *Sandstrom,* the supreme court observed that the lots in the subdivision which were not burdened by a one-and-one-half-story restriction were located next to a hillside, where the structures built on them "[did] not interfere with the view of any other homeowners in the subdivision." *Id.* at 497, 583 P.2d at 977. Although the supreme court made this observation in the context of determining whether the height restriction had been abandoned, *see supra* part VI, we believe it is equally relevant in examining whether there was a common plan to protect views.

Based on the topography and the witnesses' testimony, it is apparent that one-story restrictions on other lots were not needed to protect the views of the upslope lot owners because the absence of this restriction on the other lots would not impair such views. Lots 2 through 5, the upslope lots, obviously would not require a height restriction to protect their views.

Height restrictions on Lots 7 through 10 were not considered by the parties' expert witnesses to be "critical" to protecting the upslope lot owners' views. Johnson testified that "it makes common sense that the three lots that do have the one-story height restriction ... are the most critical in this subdivision and the one[s] that have the most view[-]destroying or view[-]blocking potential lots in this subdivision." Reinhardt also acknowledged that, in his deposition, he stated that Lots 11, 12, 14, and 15 were "probably the most critical" for imposing height restrictions to protect the views from the other lots. Assuming that view protection was the reason for imposing height restrictions on Lots 11, 12, and 14, Reinhardt further agreed that the height restrictions were imposed pursuant to a common plan.[21] Therefore, the lack of a one-story height restriction on other lots was not inconsistent with a common plan for height restrictions in the subdivision.

3.

Finally, we believe the conveyances of Lots 11, 12, and 14, subsequent to the March 27, 1940 agreement of sale for Lot 4 and the April 4, 1940 deed to Lot 5, provide evidence that a common plan of one-story restrictions existed when Fogarty entered into the agreement of sale for Lot 4 and conveyed the deed to Lot 5. Lot 4 was the first lot in the subdivision that Fogarty agreed to sell, and Lot 5 was the first lot Fogarty conveyed. As we have observed, Lots 4 and 5 were upslope lots, which were not subjected to and did not require one-story restrictions to protect their own views or the views from the other lots. The subsequent conveyances demonstrated

---

21. Reinhardt agreed to this at trial:

[Plaintiffs' counsel:] Now, would you agree with me that if protection of the views from lots 2 through 5 was in fact the reason for the one-story height restrictions on lots 11, 12, and 14, that those restrictions were imposed as part of the common plan or scheme for the subdivision?

[Reinhardt:] As a hypothetical, yes.

Fogarty and his estate's intent to protect the views that existed when Fogarty began selling lots in the subdivision. We therefore determine that a common plan of height restrictions for the subdivision existed when the agreement of sale for Lot 4 was executed and the deed to Lot 5 was transferred.

### D.

■ "For covenants to run in equity, courts require that: (1) the covenant 'touch and concern' the land; (2) the original covenanting parties intend the covenant to run; and (3) the successor to the burden have 'notice' of the covenant." 9 R. Powell, *Powell on Real Property* § 60.04[1], at 60–44. In part III, *supra,* we concluded that the height and setback restrictions touched and concerned the land, and that the original covenanting parties intended these covenants to run with the land. Although the predecessors of the Sr. Fongs, and, as Defendants argue, the Jr. Fongs acquired their lots before the restrictions on Lot 11 were imposed, conveyances subsequent to Lots 4 and 5 established the existence of a common plan of height and setback restrictions which was "settled" when sales of the subdivision lots began. This common plan "enable[s] the restrictions to be made appurtenant to [Lots 4 and 5] which [were] earlier conveyed by the common vendor." *Snow,* 197 N.E. at 228.

■ We conclude in part VII, *infra,* that Defendants had at least constructive and perhaps actual notice of the height and setback restrictions. "Notice may be actual or constructive and is a general requirement for the enforcement of equitable restrictions." 9 R. Powell, *Powell on Real Property* § 60.03, at 60–25–26 (1997 rev.). We therefore hold that Plaintiffs may enforce the height and setback restrictions as equitable servitudes.

### V.

Plaintiffs also assert that they may enforce the restrictions on Lot 11 as third-party beneficiaries to the agreement made by the Fogarty Estate and the De Canios, as reflected

22. Defendants also raised this argument at trial, but the court did not make any findings on the

in the deed between those parties. Based on our disposition of this case, we need not and therefore do not decide this claim.

### VI.

■ Alternatively, Defendants maintain that Plaintiffs abandoned any right they may have had to enforce the height restriction on Defendants' Lot 11 because Plaintiffs "acquiesced in and did not object to the construction of two-story structures on the only other two lots restricted (Lots 12 and 14 ... )" in the subdivision.[22]

In considering a similar argument, the Hawai'i Supreme Court has held that

> [t]he question of abandonment is one of fact, and the burden of proof on this issue is on the defendant. . . .
>
> In order to support a finding of abandonment, it must be shown that the lot owners of the subdivision acquiesced in *substantial and general violations* of the covenant within the restricted area.

*Sandstrom,* 59 Haw. at 496–97, 583 P.2d at 976. The plaintiffs in that case were not found to have abandoned their right to enforce a one-and-one-half-story height restriction against defendants because the only other lots on which multi-story homes had been built in the subdivision were lots that were not subject to the restriction. *Id.* at 497, 583 P.2d at 977.

Importantly, however, the supreme court observed that

> even if the three multi-story homes ... *were* covered by the restrictive height covenant, the fact that these homes ... were allowed to be built *does not in any way serve to defeat the purpose for which the covenant was imposed. The view and privacy of the homeowners in [the subdivision] have not been destroyed,* and the presence of these few multi-story homes does not, in our opinion, constitute such a "substantial and general" acquiescence on the part of the lot owners in the subdivision so as to support a finding of abandonment.

issue of abandonment. *See supra* note 9.

*Id.* at 497–98, 583 P.2d at 977 (first emphasis in original; second emphasis added).

As we have concluded above, the intent of the one-story restriction was to protect the views of the owners of upslope Lots 3, 4, and 5. Both Reinhardt and Johnson agreed at trial that the two-story houses on Lots 12 and 14 appeared to be only one-story from the street level. Reinhardt then acknowledged that the houses on Lots 12 and 14 did not obstruct the views from the upslope lots:

> [Plaintiffs' counsel:] So the—so the structures that are below the level of the street on [Lots 12 and 14], whether they are basements or first floors, do not affect the views from lots 2 through 5, do they?
>
> [Reinhardt:] Correct.
>
> [Plaintiffs' counsel:] So if the intent of the one-story height restrictions on lots 11, 12 and 14 was to protect the views from those lots, then the structure of the [houses on Lots 12 and 14] do not violate that intent, do they?
>
> [Reinhardt:] That's correct. The structures are lower than [Defendants'] residence. There's no question about that.

Given this testimony that the two-story structures on Lots 12 and 14 do not impact the views from the upslope lots, we cannot agree that these structures "constitute such a 'substantial and general' acquiescence on the part of [Plaintiffs] so as to support a finding of abandonment" by Plaintiffs. *Sandstrom,* 59 Haw. at 497–98, 583 P.2d at 977. Consequently, as we have held, the Jr. Fongs may enforce the one-story restriction as a restrictive covenant or, alternatively, an equitable servitude, and the Sr. Fongs may enforce this restriction as an equitable servitude.

## VII.

### A.

In granting Defendants' motion and entering judgment in favor of Defendants, the court denied Plaintiffs' request for an injunction prohibiting violations of the restrictive covenants imposed on Lot 11. "[T]he grant or denial of equitable relief is a matter 'ad-dressed to the sound discretion of the trial court and will not be set aside unless manifestly against the clear weight of the evidence.'" *Ingledue v. Dyer,* 85 Hawai'i 84, 91, 937 P.2d 925, 932 (App.) (quoting *Jenkins,* 58 Haw. at 598, 574 P.2d at 1342), *cert. granted,* 85 Hawai'i 81, 937 P.2d 922, *cert. dismissed,* 85 Hawai'i 196, 940 P.2d 403 (1997). Because we believe that the court erred in dismissing Plaintiffs' claims and for the reasons set forth below, we conclude the court's refusal to grant an injunction to Plaintiffs was an abuse of discretion.

### B.

*Sandstrom* is instructive in the remedy to be granted to Plaintiffs for Defendants' violations of the height and setback restrictions.[23] Restrictive covenants are "'enforceable through the equitable relief afforded by an injunction.' As such, because the court is enforcing an established legal right embodied in the covenants, 'the relative hardships to the parties has [sic] no application to the award of final relief to the plaintiff.'" *Sandstrom,* 59 Haw. at 499, 583 P.2d at 978 (quoting *McDonough v. W.W. Snow Construc. Co.,* 131 Vt. 436, 306 A.2d 119, 122 (1973)); *see also Pelosi v. Wailea Ranch Estates,* 10 Haw.App. 424, 444–445, 876 P.2d 1320, 1329, *reconsideration denied,* 10 Haw.App. 631, 879 P.2d 591, *cert. denied,* 77 Hawai'i 373, 884 P.2d 1149 (1994). As a result, "where a property owner 'deliberately and intentionally violates a valid express restriction running with the land *or intentionally "takes a chance,"* the appropriate remedy is a mandatory injunction to eradicate the violation.'" *Sandstrom,* 59 Haw. at 500, 583 P.2d at 978 (quoting *Peters v. Davis,* 426 Pa. 231, 231 A.2d 748, 751 (1967) (emphasis added)).

Arguing that they "had no *actual* knowledge of the one-story restriction until after [the Sr. Fongs] brought it to their attention ... after the second story was completed[,]" Defendants maintain they did not "intentionally and deliberately violate the restrictions or intentionally assume the risk of such viola-

---

23. At trial, Reinhardt testified that the front porch of Defendants' house appeared to protrude into the fifteen-foot setback area. Also, during oral argument before this court, Defendants' counsel represented that the portico of the house did in fact extend over the setback line.

tion" and thus the court must balance the equities in determining the remedy. (Emphasis added.) While the defendants in *Sandstrom* were found to have had both actual *and* constructive notice of the height restriction they violated, the supreme court indicated that actual *or* constructive notice would support the granting of a mandatory injunction. *Sandstrom*, 59 Haw. at 499, 583 P.2d at 978. In discussing *McDonough*, the supreme court observed that "the fact that the defendant *actually or constructively knew of the restriction*, and yet proceeded with construction of the second story" was "[o]f particular significance to the court in *McDonough* [.]" *Sandstrom*, 59 Haw. at 499, 583 P.2d at 978 (emphasis added). The defendant in that case " 'acted at its own peril without first obtaining a resolution of the covenant' " and the Vermont court held that " 'he [or she] who takes land with notice of such a restriction will not in equity and good conscience be permitted to act in violation of the restriction.' " *Id.* (quoting *McDonough*, 306 A.2d at 122).

### C.

■ While it may be inferred from the evidence that Defendants had actual notice, it is not disputed that Defendants, before beginning construction of the second story, had *constructive* notice of the height and setback restrictions through the recorded deeds in their chain of title.[24]

■ Defendants' deed provided that the conveyance was subject to the restrictions and covenants contained in the De Canios—Mendoncas deed. A review of that deed would have revealed the height and setback restrictions on Lot 11, originally imposed by the Fogarty Estate in its deed to the De Canios. "Where a covenant is contained in a prior instrument within the successor's direct chain of title conveying that land in fee simple, the successor is charged with constructive notice of the covenant." 9 R. Powell, *Powell on Real Property* § 60.04[2], at 60–74 (1997 rev.). Susan, a licensed real estate salesperson, also admitted at trial that her father had told her to "watch the height" and

"in this neighborhood, . . . you got to watch the height," but she testified that she believed these statements referred to the building code.

Susan also testified that she informed her building contractor's agent about her father's warning to "watch the height" and asked the agent if he needed to examine the deeds. According to Susan, the agent did not review the deeds and told her "we're a reputable company. We always follow applicable rules." The supreme court in *Sandstrom* rejected a similar "purported claim of innocence" by defendants based on their reliance on an architect's opinion that their construction did not violate the restrictive covenant at issue. *Sandstrom*, 59 Haw. at 500, 583 P.2d at 978. The defendants' "mistaken assumption that they were acting legally and properly did not confer immunity upon them from the right of [the plaintiffs] . . . to seek equitable enforcement of the restriction." *Id.*

■ It is also not disputed that Defendants had actual notice of their violations before the second story was actually completed. Although construction on Defendants' house was stopped temporarily on April 14, 1995, Susan admitted that she knew about the one-story restriction when she told the contractor to resume construction on May 2, 1995. *See Pelosi*, 10 Haw.App. at 445, 876 P.2d at 1330 (observing that the defendants' completion of their construction "despite [the plaintiff's] warnings that such construction was a violation of the covenant" was evidence that the defendants "may have deliberately and intentionally violated the restrictive covenant, or at least intentionally assumed the risk of such violation"). In light of Susan's instruction to "restart construction," we find unpersuasive Defendants' contention that construction was resumed merely to "secure [the second story's] contents from the elements." We conclude, therefore, that Defendants must be ordered to remove any portions of the house and portico in non-compliance with the one-story and fifteen-foot setback restrictions contained in the De Canios—Mendoncas deed.

---

24. At oral argument before this court, Defendants' counsel represented that his clients had

constructive notice of the restrictions contained in the recorded deeds to their property.

## VIII.

For the foregoing reasons, the August 1, 1995 "directed verdict" order and the October 27, 1995 judgment are vacated, including the award of costs to Defendants, and the case is remanded to the court. On remand, the court is instructed to enter judgment in favor of Plaintiffs on their request for a mandatory and permanent injunction, and to award such other and further relief as may be appropriate under this decision.