994 P.2d 500

Leonard K.K. FONG and Ellen Lee Fong, Respondents–Appellants,

and

Dale S.N. Fong and Linda L. Fong, Intervening Plaintiffs–Appellants,

v.

Muriel Y. HASHIMOTO and Susan M. Hashimoto, as Trustees of the Living Trust of Gerald S. Hashimoto and Muriel Y. Hashimoto dated October 13, 1992,and Susan M. Hashimoto, individually, Petitioners–Appellees.

No. 19424.

Supreme Court of Hawaiʻi.

Feb. 1, 2000.

Reconsideration Denied March 9, 2000.

R. Laree Mcguire and Jared N. Kawashima (Michael A. Lilly of Ning, Lilly & Jones with them on the briefs), for petitioners–appellees.

Trudy Burns Stone (Andrew R. Bunn of Chun, Kerr, Dodd, Beaman & Wong with her on the brief) for respondents–appellants.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by KLEIN, J.

## I. SYNOPSIS

We granted the application for a writ of certiorari filed by Petitioners–Appellants Muriel Y. Hashimoto and Susan M. Hashimoto, as Trustees of the Living Trust of Gerald S. Hashimoto and Muriel Y. Hashimoto (the Hashimoto trustees), and Susan M. Hashimoto (Susan) individually (collectively the Hashimotos), to review the decision of the Intermediate Court of Appeals (ICA) in *Fong v. Hashimoto*, 92 Hawai‘i 637, 994 P.2d 569, 1998 WL 71951 (Haw.Ct.App.1998) (hereinafter, the "ICA's opinion"). In *Fong*, Leonard K.K. Fong and Ellen Lee Fong (Senior Fongs), along with Dale S.N. Fong and Linda L. Fong (Junior Fongs) (collectively Fongs), appealed the circuit court's dissolution of a temporary restraining order (TRO) against the Hashimotos building a two-story home and granting the Hashimotos' motion to dismiss. The ICA vacated and remanded the circuit court's dismissal, holding, *inter alia*, that the retention of legal title, pursuant to an agreement of sale (a/s), is a sufficient interest to impose a restrictive covenant and that the restrictive covenant, burdening the Hashimotos' lot, could also be enforced as an equitable servitude. For the following reasons, we reverse the ICA's opinion inasmuch as the "one-story in height" restriction is ambiguous, and therefore, unenforceable in law.[1] Moreover, we disagree with the ICA's analysis and emphasize that Fogarty failed to create a legally enforceable restrictive cove-

1. Because we determine that the "one-story in height" restriction is unenforceable, we need not address the remaining enforcement issues of abandonment and whether a mandatory injunction is the proper remedy for a violation of a restrictive covenant.

nant over Lot 11 simply by describing a one-story height restriction in the deed to Lot 11.

## II. DISCUSSION

We agree with the essential facts, as set forth in the ICA's opinion as follows:

The parties own lots in an Alewa Heights subdivision, known as the "Fogarty Subdivision," named for the common grantor of the lots, Edward Fogarty. The subdivision consists of fifteen lots. Upon entering the Fogarty Subdivision, Lots 4 and 5 are adjacent lots located to the left, on the mauka side of the road. The Junior Fongs own Lot 4, and the Senior Fongs own Lot 5. Lot 11, owned by the Hashimotos, is located on the makai side of the road, facing Lots 4 and 5.

The history of the Junior and Senior Fongs' title is as follows. On March 27, 1940, Fogarty entered into an unrecorded a/s to sell Lot 4 to John Carden Austin and Frances W. Austin (Austins). The Austins assigned this a/s to James Akana Ai and Frances Leon Ai (Ais) by an unrecorded assignment, dated May 12, 1942. The administrators of Fogarty's estate conveyed Lot 4 by way of a recorded deed to the Ais on January 24, 1944. The following covenant was contained in the deed:

> That at no time shall any building or structure or any part thereof be erected or placed or allowed to remain on [Lot 4] within fifteen (15) feet of the property boundary line on the 20–foot right-of-way adjoining said premises.

The Fogarty–Ai deed did not mention any height or view restrictions. On September 21, 1984, the Ais conveyed Lot 4 to the Junior Fongs through a recorded deed.

On April 4, 1940, Fogarty executed a deed conveying Lot 5 to Noel Lee–Von Howell and Verona O. Howell (Howells). The deed contained the following setback restrictions:

> [A]t no time shall any building or structure or any part thereof be erected or placed or allowed to remain on [Lot 5] within fifteen (15) feet of the property boundary line on the 20–foot road right-of-way adjoining said premises, nor within five (5) feet of the property boundary line on the 15–foot road right-of-way adjoining said premises.

No view or height restrictions were mentioned in the Fogarty–Howell deed. The chain of title from the Howells to the Senior Fongs is unbroken, the Senior Fongs acquiring Lot 5 by way of a November 29, 1968 recorded deed from Martin Fried and L. Louise Fried (Frieds).

By way of an unrecorded a/s dated April 5, 1941, Fogarty agreed to sell Lot 11 to Franklyn J. De Canio and Lucille C. De Canio (De Canios). On June 26, 1943, the administrators of Fogarty's estate conveyed Lot 11 to the De Canios by a recorded deed. The deed provided that "IT IS UNDERSTOOD AND AGREED that the execution of the within indenture by the Grantors shall constitute full compliance with and performance by [Fogarty] and the Grantors of any obligations under [the April 5, 1941 agreement of sale]."

The De Canios agreed to several restrictive covenants by the following provisions in their deed:

> AND the Grantees, in consideration of the premises and of One Dollar ($1.00) received to their satisfaction from the Grantors, do hereby for themselves and their assigns, and the survivor of them and his or her heirs and assigns, covenant and agree with the Grantors and their successors and assigns, as follows:
>
> 1. That at *no time shall any building or structure or any part thereof be erected or placed or allowed to remain on the hereinabove described premises of more than one (1) story in height,* nor within fifteen (15) feet of the property boundary line on the 20–foot road right-of-way adjoining said premises, nor within five (5) feet of the property boundary line on the 15–foot road right-of-way adjoining said premises.
>
> 2. That no deed, lease, mortgage or other conveyance of the premises hereby conveyed will be made unless the same shall in each case contain the same restrictive covenants, including this covenant, either expressly or by appropriate reference, nor unless or until the grantee, lessee, mortgagee, or other person thereunder shall join therein and bind himself, his

heirs and assigns to require the same covenants on the part of any grantee, lessee, mortgagee, or other person under any deed, lease, mortgage or other conveyance made by him.

3. That the foregoing *covenants shall run with the land hereby conveyed and shall also apply to and be equally binding upon the legal representatives and successors in interest of the parties hereto,* whether or not expressly contained in any deed or other instrument whereby any title to or interest in said property is obtained.

(Emphases added.)

The De Canios then conveyed Lot 11 to Adolph J. Mendonca and Violet G. Mendonca (Mendoncas) by way of a recorded deed dated August 16, 1943. The De Canio–Mendonca deed contained the same restrictive covenant provisions as quoted above. In turn, the Mendoncas conveyed Lot 11 to Gerald S. Hashimoto and Muriel Y. Hashimoto (Mr. and Mrs. Hashimoto) in a recorded deed dated February 19, 1946. The Mendonca–Hashimoto deed stated that the conveyance was "subject ... to ... [,*inter alia,*] [t]he covenants and building restrictions relative to the use of said land as set forth in [the De Canio–Mendonca deed.]" The Mendonca–Hashimoto deed did not detail the specific covenants and building restrictions.

On October 13, 1992, Mr. and Mrs. Hashimoto executed a warranty deed, which they later recorded, conveying Lot 11 to the Hashimoto trustees. The warranty deed's attached Exhibit A described the property and stated that the conveyance was "subject to [,*inter alia,*] all grants, easements, covenants, restrictions, liens and encumbrances of record." Finally, on December 23, 1994, the Hashimoto trustees executed a recorded deed conveying an undivided one-half interest to Susan, as a tenant in severalty, and retaining the other undivided one-half interest in the Hashimoto trustees as a tenant in common. This most recent deed provided that the conveyance of Lot 11 was "subject ... to ... [,*inter alia,*] [r]estrictions, cove-

nants and conditions as contained in [the De Canio–Mendonca deed]."

The dispute between the parties arose in January 1995, when the Hashimotos began building a two-story home on Lot 11. On April 7, 1995, Ellen L. Fong (Ellen) spoke to the owners of Lot 14, who explained that they did not build a higher house because of the restriction in their deed. Ellen then spoke to Susan's sister, Sandra Suan (Sandra), informing her that the house on Lot 11 might be too high. On April 12, 1995, Sandra obtained the deed to Lot 11 from her father's study and told Susan that there were restrictive covenants in the deed. The Senior Fongs sent a letter dated April 14, 1995 to the Hashimotos' contractor, Armstrong Builders (Armstrong), advising them that the construction of the Hashimotos' home "may be violating certain restrictions placed upon [Lot 11] by the developers [that] are recorded within [the Hashimotos' deed]." Construction stopped on April 14, 1995, but the Hashimotos instructed Armstrong to resume construction on May 2, 1995.

On May 30, 1995, the Senior Fongs filed a complaint against the Hashimotos seeking declaratory and injunctive relief. The Senior Fongs alleged that "[the Hashimotos'] two-story building, if permitted to remain, w[ould] severely interfere with and shut off the view from the [Senior] Fong's [sic] home, to their great detriment."

On June 2, 1995, the circuit court issued a temporary restraining order (TRO), pursuant to a motion by the Senior Fongs "in order to prevent further harm to [the Senior Fongs], to preserve the status quo and the equities of the parties until a hearing may be held on [the Senior Fongs'] motion for preliminary injunction."

On June 28, 1995, the Junior Fongs filed a motion to intervene pursuant to Hawai'i Rules of Civil Procedure (HRCP) Rule 24.[2] Representing that their property also benefitted from the height restriction on the Hashimotos' lot, and that the Junior Fongs

---

2. HRCP RULE 24(a)(2) provides in relevant part:
 when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that

the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

had "an unbroken line [of title] to the grantor of [the Hashimotos'] property[,]" the Junior Fongs claimed that it was "necessary" for them to intervene because "their interest may not be protected by [the Senior Fongs'] participation." The circuit court granted the Junior Fongs' motion, and on June 29, 1995, the Junior Fongs filed a complaint seeking the same relief as the Senior Fongs.

■ A jury-waived trial took place on July 12 and 13, 1995. Subsequently, on August 1, 1995, the circuit court entered its findings of fact (FOF) and conclusions of law (COL) along with a directed verdict for the Hashimotos. The circuit court also ordered that the June 2, 1995 TRO be dissolved.[3] The following FOF are relevant to our disposition:

6. [The Fongs'] Lots 4 and 5 are situated at a higher elevation, mauka and directly across the road from [the Hashimotos'] Lot 11.

9. The 3 adjoining lots owned by the Kogamis [Lot 14], Shiromas [Lot 12], and the Defendants [Lot 11] are makai of the private road and downslope of the lots owned by [the Fongs].

10. Only Lots 11, 12 and 14 in the Fogarty Subdivision[,] owned by the Kogamis, Shiromas and [Hashimotos], have a one-story height restriction in their deeds.

11. The subdivision map filed with the City and County of Honolulu in 1938 clearly sets forth a building set back [sic] for the lots which abut the private road. However, no height restriction is indicated as to any lot on the subdivision map.

19. Although Lots 4, 5 and 11 were all owned at one time by [Fogarty] or his heirs, Lots 4 and 5 were transferred by Fogarty prior to the transfer of Defendant's Lot 11.

The following COL are also relevant to out disposition:

4. In order for [the Fongs] to be able to enforce the restriction, the restrictive covenant must run with the land and benefit their lots (Lots 4 and 5).

8. [The Senior Fongs] derive their interest in Lot 5 through the April 4, 1940 conveyance from Fogarty. When Fogarty conveyed [the Hashimotos'] property in 1943 he no longer had any property interest in [the Senior Fongs'] Lot 5. Having no property interest in Lot 5, Fogarty could not burden Lot 11 with a height restriction for the benefit of Lot 5 which he no longer owned.

9. Therefore, the one-story restrictive covenant imposed by Fogarty in his deed to the De Canios does not benefit Lot 5, a lot in which he no longer had any interest, and [the Senior Fongs] neither have the standing nor the right to enforce the restrictive covenant on [the Hashimotos'] lot.

10. [The Junior Fongs] derive their interest in Lot 4 through the March 27, 1940 agreement of sale from Fogarty to the Austins ... [B]y the agreement of sale Fogarty transferred his equitable interest in Lot 4 to the Austins, retaining in himself the legal interest to Lot 4.

13. The Fogarty–Austin agreement of sale conveyed all of Fogarty's property interest in Lot 4 to the Austins in 1940. Fogarty thereafter had no more property interest in Lot 4. As a result, when Fogarty conveyed Lot 11 to the De Canios in 1943, he could not burden Lot 11 with a height restriction for the benefit of Lot 4 in which he had no property interest. Fogarty neither had privity of estate with Lot 4 nor did he have any property interest in Lot 4 in favor of which he could burden Lot 11.

14. Therefore, the one-story restrictive covenant imposed by Fogarty in his deed to the De Canios does not benefit Lot 4, a lot in which he no longer had any interest, and [the Junior Fongs] neither have the standing nor the right to enforce the restrictive covenant on Defendants' lot.

Final judgment was entered in favor of the Hashimotos and against the Fongs on October 27, 1995. On November 21, 1995, the Fongs filed their notice of appeal.

---

**3.** A motion for a directed verdict made under Hawai'i Rule of Civil Procedure (HRCP) Rule 50(a), when made in a bench trial, is treated as a motion to dismiss made under HRCP Rule 41(b). *Ontai v. Straub Clinic and Hospital,* 66 Haw. 237, 252, 659 P.2d 734, 745 (1983).

On appeal from the circuit court, the ICA held that: (1) legal title to land retained by a vendor pursuant to an a/s is an interest sufficient to permit the vendor to impose restrictions on another parcel of land for the benefit of the land subject to the a/s; (2) because a "common scheme" of one-story and setback restrictions was imposed on the subdivision by the common grantor, and because conveyances evidenced a common scheme existing when the sale of lots in the subdivision began, the restrictions may be enforced as equitable servitudes; (3) the owners of the upslope lots did not abandon their right to enforce the height restriction, despite the construction of two-story homes on other height-restricted lots; and (4) that a mandatory injunction is the appropriate relief. ICA at 643, 994 P.2d at 575. In doing so, the ICA vacated and remanded the circuit court's grant of the motion to dismiss in favor of the Hashimotos.

In other words, the ICA held that: (1) Fogarty's retention of legal title to Lot 4 was a sufficient interest to impose the restrictive covenant on Lot 11 in favor of the Fongs' predecessors; (2) there was a common plan for the Fogarty Subdivision that allowed the Fongs to enforce the height restriction as an equitable servitude; (3) the Fongs did not abandon their right to enforce the height restriction as against the Hashimotos despite the Fongs' failure to protest the construction of the other two story homes with similar height restrictions; and (4) the Fongs are entitled to mandatory injunctive relief to prevent the Hashimotos from building the second story of their home.

On March 23, 1998, the Hashimotos applied for a writ of certiorari seeking review of the ICA's opinion, which we granted on April 2, 1998.

### III. ANALYSIS

A. *The "one-story in height" restriction is unenforceable.*

 Because of this court's recent decision in *Hiner v. Hoffman*, 90 Hawai'i 188, 977

P.2d 878 (1999) (holding that a "two-story in height" restriction was ambiguous and therefore unenforceable), the restriction over the Hashimotos' Lot 11, worded as a "one-story in height" restriction, is likewise ambiguous, and therefore unenforceable.[4]

Furthermore, we granted certiorari to correct the ICA's analysis with respect to the possibility of an equitable servitude over the Hashimotos' Lot 11 and the lack of a creation of a legally enforceable restrictive covenant by the common grantor.

B. *There is no common scheme or plan to support an equitable servitude in favor of the Fongs.*

 The ICA determined that the height restriction placed in the deed to the Hashimotos' Lot 11 was enforceable, by the Fongs, as an equitable servitude because the height restriction was part of a common scheme or plan created by Fogarty. However, restrictions on only three of the fifteen lots in the subdivision do not constitute a clear "common scheme or plan." *Olson v. Albert,* 523 A.2d 585, 588 (Me.1987) (restrictions in four of sixteen subdivided lots were insufficient to establish a common scheme). A common grantor may establish a general scheme by conveying the majority of his subdivided lots subject to a restriction that reflects the general scheme. *3 W Partners v. Bridges,* 651 A.2d 387, 389 (Me.1994).

As the evidence in this case reveals, Fogarty conveyed only three of the fifteen lots in the subdivision with a height restriction. There was also a fourth lot, similarly situated to the three burdened lots, that was not restricted. Moreover, the conveyances and restrictions were generated in a piecemeal fashion, not evidencing a "common scheme or plan." If Fogarty's original intent was to create a subdivision with universal height restrictions, he could have provided for such restrictions at the same time that he provided for setback restrictions. However, Fogarty chose not to describe height restrictions on the plat map filed with the City and County of Honolulu in 1938.

---

4. We note that neither the circuit court, nor the ICA had the benefit of our decision in *Hiner,*

which was filed on May 18, 1999.

A general building scheme may be defined as one under which a tract of land is divided into building lots, to be sold to purchasers by deeds containing uniform restrictions. *Hagan v. Sabal Palms, Inc.,* 186 So.2d 302, 307 (Fla.Dist.Ct.App.), *cert. denied,* 192 So.2d 489 (Fla.1966). The courts will only discern such a scheme from a plan of lots and sales where all the deeds from the common grantor for the lots making up any particular neighborhood group of common benefit therefrom are made subject to the common covenant. *Scull v. Eilenberg,* 94 N.J. Eq. 759, 121 A. 788, 793 (Err. & App. 1923). In the instant case, there was no uniformity throughout the subdivision as to height restrictions because twelve of the fifteen lots in the subdivision were not subjected to a height restriction. Therefore, there was no "common scheme or plan" to support the enforcement of the height restriction, by the Fongs, as an equitable servitude.

C. *A restrictive covenant enforceable at law was not created.*

The ICA held that an a/s vendor's mere legal interest in an upslope lot is sufficient to impose a height restriction over a downslope lot favoring the upslope lot or lots. We disagree with the ICA's proposition and emphasize that, as a matter of law, a restrictive covenant burdening a downslope lot for the benefit of an upslope lot is not enforceable at law when either (1) the deeds to the affected lots do not contain a recitation establishing which lot or lots are to be benefitted or burdened by the restriction or (2) the common grantor simply does not have a sufficient interest in the affected properties to create an enforceable restrictive covenant with respect to the benefitted lots.

In point of fact, Fogarty, as vendor under the a/s to the Fongs' predecessors in title, did not establish in them the duty to enforce the restrictive covenant over Lot 11 for their or their successors' benefit. There is no reference in the deed to Lot 11 to the property or properties to be benefitted by the restrictive covenant. Thus, because Fogarty did not designate a dominant parcel or parcels with the corresponding right of enforcement in the deed to Lot 11, there can be no legal enforcement of a valid restrictive covenant.

A restrictive covenant is a contract dependent upon reciprocal or mutual burdens and benefits. *Houston Petroleum Co. v. Automotive Products Credit Ass'n,* 9 N.J. 122, 87 A.2d 319, 323 (1952). Thus, although the Hashimotos had notice that their lot was restricted, their deed did not contain any reference to the dominant parcel or parcels, a required element of a real covenant. 20 Am.Jur.2d Covenants, Conditions and Restrictions § 25 at 594 (1965).

Moreover, Fogarty did not even have the right to create an enforceable restrictive covenant benefitting Lots 4 or 5. On April 4, 1940, the Senior Fongs' Lot 5 was conveyed by deed to the Howells, more than a year before Fogarty entered into an a/s for the Hashimotos' Lot 11. Put simply, Fogarty retained absolutely no interest in the Senior Fongs' Lot 5 at the time that the height restriction over Lot 11 was created. Therefore, as the circuit court properly determined, it is not possible for the Fongs' Lot 5 to be the beneficiary of the height restriction over Lot 11, under any of the theories considered by the ICA, because Fogarty did not have any right to create a restrictive covenant either benefitting or burdening a lot in which he no longer had any interest.

With respect to the Junior Fongs' Lot 4, at the time that the height restriction over Lot 11 was created, Fogarty retained bare legal title to Lot 4 pursuant to an a/s with the Austins. This court's decision in *Bank of Hawaii v. Horwoth,* 71 Haw. 204, 787 P.2d 674 (1990), is the starting point of our analysis.[5] In *Horwoth,* the equitable owners under an a/s were permitted to receive the monetary surplus after the legal title holder went into foreclosure and the property was sold to satisfy the mortgage. However, *Horwoth* did not determine either the range or the scope of rights that the

---

**5.** *Horwoth* was the primary case cited by the Hashimotos and relied upon by the ICA in its analysis.

vendor under an a/s retains as legal title holder during the executory period of the a/s. Thus, *Horwoth* does not help us decide whether the vendor under an a/s can burden property he owns for the benefit of property to which he holds bare legal title.

In its opinion, the ICA reasoned that:

While the "essential[ ]" purpose of retaining legal title is to secure "payment by the [purchaser] or the purchase price[,]" *id.*, legal title held by the vendor is relevant for other purposes. For example, a vendor's written consent to a transfer of the property is required so long as the vendor retains legal title. *Jenkins v. Wise,* 58 Haw. 592, 599, 574 P.2d 1337, 1342 (1978). A vendor with legal title may also maintain an action "to quite title [to the land conveyed] or [to] remove a cloud therefrom." *Kern v. Robertson,* [92 Mont. 283] 12 P.2d 565, 568 (Mont.1932). So long as a vendor retains legal title, the vendor may impose restrictions on property subject to a land sale contract, *Kotesky v. Davis,* [355 Mich. 536] 94 N.W.2d 796, 798 (Mich.1959), and enforce restrictions on the use of such property, *Baxter v. Ogooshevitz,* [205 Mich. 249] 171 N.W. 385, 388 (Mich.1919); *cf. Storey v. Brush,* [256 Mass. 101] 152 N.E. 225, 226 (Mass.1926) (concluding that vendors who held mortgages on certain parcels to secure unpaid purchase money had an interest in enforcing restrictions on those parcels).

Subsequently, the ICA concluded that there is:

no meaningful reason to conclude that because legal title is retained essentially to secure payment of the purchase price under and agreement of sale, a vendor's legal title would not be a sufficient interest to support the vendor's imposition of restrictive covenants on other land for the benefit of the land subject to the agreement of sale.

However, a careful examination of the cases that the ICA relies upon reveals a lack of support for the proposition that a vendor has the authority to burden or benefit a

parcel to which he only retains bare legal title.

In its opinion, the ICA construed *Kern* as holding that "[a] vendor with legal title may also maintain an action 'to quiet title [to the land conveyed] or [to] remove a cloud therefrom.'" The Supreme Court of Montana actually stated that "[a] mere contract to convey land will not divest the vendor of his right to maintain an action to quiet title or to remove a cloud therefrom when the legal title remains with him." *Kern,* 12 P.2d at 567. Aside from the self-evident obligation of a legal title holder to defend legal title, *Kern* has been recognized for the *Horwoth*-like proposition that:

The authorities are in accord that an enforceable contract for the purchase and sale of real property passes to the purchaser the equitable and beneficial ownership thereof, leaving only the naked legal title in the seller, as trustee for the purchaser, and as security for the unpaid purchase price.

*Johnson v. Equipment Used to Cultivate Marijuana,* 271 Mont. 500, 898 P.2d 1200, 1202 (1995) (quoting *Kern v. Robertson,* 92 Mont. 283, 12 P.2d 565, 567 (1932)); *Matter of Wooten's Estate,* 198 Mont. 132, 643 P.2d 1196, 1199 (1982).

The ICA's reliance on *Kotesky* is similarly dubious.[6] Moreover, *Kotesky* does not support the legal proposition contemplated by the ICA. The Michigan Supreme Court actually states that "*[r]eciprocal negative easements* are never retroactive; the very nature of their origin forbids it. They arise, if at all, out of a benefit accorded land retained, by restrictions upon neighboring land sold by a common owner." *Kotesky,* 94 N.W.2d at 798 (emphasis added). However, there is an explicit lack of reciprocity in the deeds to the lots in the underlying case.

In its opinion the ICA points out that a vendor's written consent to a transfer of property is required so long as the vendor retains legal title. We in no way disagree with this proposition from *Jenkins.* Of course a vendor is entitled to ensure that the replacement vendee of the property, to which

---

**6.** Although *Kotesky* has not been explicitly reversed, it has not been followed in Michigan for

any proposition except for its discussion of "timeliness" in raising issues on appeal.

he retains legal title, is financially qualified. However, the contractual right to require written consent does not vest the additional power in a vendor to create a restrictive covenant for the benefit of property held solely as security for payment.

■ The ICA relies upon *Baxter* for the proposition that so long as a vendor retains legal title, the vendor may enforce use restrictions on the property. Again, we have no quarrel with this proposition. Surely, a vendor must be able to enforce bona fide contractual use restrictions while the contract to purchase the property is executory, in order to prevent the impairment of the property. However, this prudent proposition from *Baxter* does not provide support for the ICA's reasoning that retention of legal title provides the authority to impose a restrictive covenant over property which is subject to an a/s. In *Baxter*, the Michigan Supreme Court was primarily concerned with the implications of a mistake with respect to the insertion of a contested clause into a contract, not the proposition that retention of legal title is sufficient to impose a restrictive covenant over property that is subject to an a/s.

Finally, *Storey* stands for the conclusion that a vendor has an interest in enforcing use restrictions against the vendee. In *Storey*, the issue contemplated by the Michigan Supreme Court was whether a vendor could enforce an explicit use restriction, contained in a deed, over a neighboring property that the vendor had previously conveyed. Certainly, a vendor, who specifically inserts restrictions in a deed, with the intent to preserve remaining land still held by the vendor in the neighborhood, has every right to demand enforcement of the restrictions. This right of enforcement retained by the vendor (who is also the next door neighbor) does not stand as justification for a vendor creating a restrictive covenant affecting property to which he only holds legal title.

Nothing that the ICA cites supports its reasoning regarding a vendor's ability to burden or benefit property, as there is no authority providing a vendor the power to create an enforceable restrictive covenant concerning property to which he merely retains bare legal title. We therefore rule, as did the circuit court, that a vendor cannot benefit property previously sold under an a/s. If the burden and benefit were reversed in the instant case, this conclusion becomes even more lucid. For example, if Fogarty had attempted to burden a lot, previously sold pursuant to an a/s for the benefit of a property he still retained, there would be no deliberation at all. It would be absurd to allow a vendor to alter the nature of property rights, where property has been sold via an a/s, to the detriment of the vendee during the executory period. Likewise, we cannot allow a vendor to alter the nature of property rights sold pursuant to an a/s, for the benefit of the vendee, during the executory period. Either result would be unjust.

As the circuit court properly stated in its conclusions of law, Fogarty had an insufficient interest, in both Lots 4 and 5, at the time that he placed the restriction in the deed to Lot 11, to create an enforceable restrictive covenant for the benefit of Lots 4 and 5. Therefore, even without reference to *Hiner*, the Fongs attempt to enforce the height restriction contained in the Hashimotos' deed to Lot 11 must fail.

## IV. CONCLUSION

In light of this court's recent decision in *Hiner*, we vacate the ICA's decision and affirm the circuit court's judgment dissolving the TRO and granting the Hashimotos' motion to dismiss on the basis that a "one-story in height" restriction is ambiguous, and as such, is unenforceable.

Concurring and Dissenting Opinion by NAKAYAMA, J., with whom RAMIL, J. joins.

I concur in Parts III.B. and III.C. of the majority opinion. However, for the reasons expressed in my dissent in *Hiner v. Hoffman*, 90 Hawai'i 188, 196, 977 P.2d 878, 886 (1999), I do not agree that the restrictive language in this case is ambiguous and unenforceable. I further note that the Hashimotos never disputed that their house was anything but two-stories in height and never raised the issue of ambiguity until, during the pendency of this appeal, this court issued

the *Hiner* decision. *See id.* at 197, 977 P.2d at 887 ("This eleventh-hour change demonstrates that the 'ambiguity' in this case stems less from bona fide doubt in the meaning of the covenant terms than from creative, if somewhat disingenuous, appellate advocacy."). *See also In re Hawaiian Flour Mills, Inc.*, 76 Hawai'i 1, 19 n. 5, 868 P.2d 419, 437 n. 5 (1994) (holding that arguments raised for the first time in the reply briefs on appeal were deemed waived) (citing Hawai'i Rules of Appellate Procedure Rule 28(b)(4) (1985)).